UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

---

DAVID B. MERRITT, M.D.,

    Plaintiff,

vs.                                                                 Civ. No. 10-cv-00840-wmc

BLACK RIVER MEMORIAL HOSPITAL,
INC.,

    Defendant.

---

## DEFENDANT'S PROPOSED STATEMENT OF FACTS

---

Defendant, Black River Memorial Hospital, Inc., by its attorneys, PETERSON, JOHNSON & MURRAY, S.C., hereby submits its proposed statement of facts:

    1.    Plaintiff signed his first employment agreement with BRMH on December 9, 2005 and began his employment on January 15, 2006. (Winn Aff., ¶2; Exh. A)

    2.    In April 2007, complaints were received by Human Resources that plaintiff was making inappropriate comments in front of both patients and other staff. (Id., ¶3). One such comment that was reported was that upon seeing an attractive female patient, plaintiff commented that "she could sit on my face anytime." (Id., ¶4)

    3.    On April 29, 2007, the director of human resources, Holly Fredrickson[1], held a meeting with the plaintiff to explain the hospital's harassment, behavior, and productive work environment policies. (Id. ¶5, Exh. B)

---

[1] Throughout plaintiff's employment, the director of Human Resources was Holly Fredrickson, later known as Holly Winn.

4. It was explained to plaintiff at this time that some of the comments he was making were inappropriate; that he needed to think before he spoke; that he needed to consider his audience; that he needed to be aware that patients may overhear him; and that he needs to be aware of employee perception. (Id, ¶6)

5. Following that meeting, the inappropriate behavior unfortunately did not cease. Incidents of inappropriate behavior occurred in October 2007, December 2007, January 2008 and February 2008. (Id, ¶8)

6. Plaintiff had another meeting with the human resources director and President/CEO of BRMH Stan Gaynor on February 28, 2008. (Id., ¶9; Gaynor Aff., ¶4)

7. At that meeting, after reviewing the many instances of inappropriate behavior reported concerning the plaintiff, plaintiff received a written warning, was told that his behavior was unacceptable, and was told that his failure to change his behavior will result in further disciplinary action, up to and including termination. (Winn Aff., ¶11, Exh. C; Gaynor Aff., ¶5, Exh. A).

8. Plaintiff was also informed that staff members were concerned that if they made complaints about his behavior that he would "make their lives miserable." (Winn Aff., ¶12)

9. Plaintiff signed this written warning, disagreeing with only one of the statements reported. (Id., ¶13)

10. On August 25, 2008, the plaintiff and BRMH entered into a second employment contract, the term of which continued through January 2010. (Winn Aff., ¶14, Exh. D)

11. Shortly after that contract was signed, behavior issues began to reoccur. In October 2008, plaintiff continued to make inappropriate comments and also began to display anger management issues. (Id., ¶16; Gaynor Aff., ¶7)

12.     On October 25, 2008, plaintiff approached another employee of BRMH, Carl Lash, who is an RN by trade and BRMH's ED Manager, while he was meeting with another doctor and staff member in a trauma room, and demanded certain medication for a patient. (Winn Aff., ¶17; Martin Aff., ¶4)  When he was told it would not be given to him he yelled "this is fucking bullshit." (Martin Aff., ¶4)

13.     He was told at this time that if he was going to talk in such a manner he would need to go to another area.  Instead, he slammed the trauma room door shut and continued to yell and curse. (Martin Aff., ¶4)

14.     At the time of this occurrence, there were at least four other ER staff present, a housekeeper, a paramedic student and at least two patients. (Martin Aff., ¶5)

15.     Mr. Lash reported this incident and wrote of summary of the incident. (Winn Aff., ¶18, Exh. E)

16.     In October 2008, it was reported that plaintiff made the comment concerning a paramedic student "who's the gay guy?" and when staff attempted to redirect the plaintiff, he commented "well, he's holding an old ladies' hand." (Winn Aff., ¶19)  This incident was also reported and documented. (Id., Exh. F)

17.     As a result of these behaviors and others, another meeting was held on November 12, 2008, with plaintiff, the human resources director and Mr. Stan Gaynor, hospital CEO. (Winn Aff., ¶20; Gaynor Aff., ¶7)

18.     During this meeting, plaintiff was informed of the behaviors that had been reported; that the behaviors violated not only hospital policies but also his employment contract; and that he had been warned previously that such behavior could lead to further disciplinary action. (Winn Aff., ¶20; Gaynor Aff., ¶7)

19.     Plaintiff was informed during the November 12, 2008 meeting, both verbally and in writing, that he was being suspended for three days - - from November 19 through November 21 - - and that if his behavior did not change and he continued to violate company behavior policies and his employment agreement, he would be subject to further disciplinary action, including termination. (Winn Aff., ¶22; Exh. G; Gaynor Aff., 8, Exh. B).

20.     Plaintiff refused to sign the letter documenting this meeting and wrote that he would attach his own statement. (Winn Aff., ¶23; Gaynor Aff., ¶10)  However, no such statement was ever received by Ms. Winn or Mr. Gaynor. (Id.)

21.     At this time, due to the constant behavior issues being displayed by plaintiff, BRMH contemplated terminating plaintiff's employment. (Winn Aff., ¶24; Gaynor Aff., ¶11)

22.     Because the hospital was short-staffed and because BRHMH wanted to provide plaintiff every opportunity to improve his behavior as he was a valued employee and skilled physician, the hospital did not go forward with his termination at this time. (Winn Aff., ¶24; Gaynor Aff., ¶11)

23.     On December 5, 2008, the Emergency Room Director, Dr. Carol Martin, met with plaintiff to discuss the fact that further inappropriate behaviors would not be tolerated and examples of inappropriate conversations were reviewed. (Winn Aff., ¶25, Exh. H; Martin Aff., ¶6, Exh. A)

24.     Plaintiff was told that when staff became aware that a conversation was approaching inappropriateness, he will be signaled with a "cut" gesture and his conversation/storytelling must stop. (Winn Aff., ¶25, Exh. H; Martin Aff., ¶6, Exh. A)  This system was being put into place as plaintiff made it clear with Dr. Martin, Mr. Lash and Ms. Winn that he wished to be told when staff was uncomfortable with his conversation as he could not self-identify when there was a problem. (Martin Aff., ¶7, Exh. A).

25. During the December 5, 2008, discussion, Dr. Merritt's anger outbursts towards Dr. Martin, patients and staff was also discussed. (Martin Aff., ¶8, Exh. A).

26. Plaintiff was told at this time that if angry outbursts continue, further action would be pursued by human resources. (Martin Aff., ¶8) Plaintiff was also that his angry outbursts and inappropriate conversations would be reported, with plaintiff's consent, to his physician for treatment of these issues. (Martin Aff., ¶10, Exh. A)

27. Dr. Martin did contact plaintiff's physician to inform him of plaintiff's behaviors and systems put in place to curb those behaviors. (Martin Aff., ¶11, Exh. B)

28. In February 2009, plaintiff communicated by e-mail with human resources that he believed a nurse was documenting everything he was doing that would justify getting him terminated. (Winn Aff., ¶27, Exh. I)

29. Plaintiff was instructed to speak with the nurse about his concerns in order to keep the environment positive. (Id., ¶28, Exh. J). In response, plaintiff accused the nurse of having a personality disorder and stated it was a management issue. (Id., ¶29, Exh. K).

30. In March 2009, another issue arose concerning the routing of patient records to the Krohn Clinic. (Winn Aff., ¶30; Gaynor Aff., ¶12) Specifically, on March 11, 2009, it was reported to Ms. White-Jacobs, Vice President of Patient Care Services at BRMH, by Ms. Gina Ransom, that Ms. Ransom had a conversation with plaintiff that the records in question would be routed. (Winn Aff., ¶30, Exh. L; Gaynor Aff., ¶12, Exh. C) Plaintiff's response to her was both abrupt and belligerent. (Id)

31. Two months later, BRMH learned that the plaintiff was being deployed and plaintiff left for Afghanistan in June 2009. (Winn Aff., ¶31; Gaynor Aff., ¶13)

32. Although he was away from the hospital during his time, his communications with the hospital did not stop. (Winn Aff., ¶32; Gaynor Aff., ¶14; Martin Aff., ¶12)

33. Plaintiff was sending e-mail correspondence concerning other issues taking place at the hospital. Such issues included a new initiative for ER staff members to have access to the Krohn Clinic records. (Winn Aff., ¶32, Exhs. M & N; Martin Aff., ¶12, Exh. C) Plaintiff responded from Afghanistan, disagreeing with the policy. (Id.)

34. In late July 2009, plaintiff began to e-mail human resources and others staff members about a wage issue. (Winn Aff., ¶33, Exh. O; Martin Aff., ¶13, Exh. D)

35. Plaintiff believed that he was not properly paid for certain shifts and threatened to contact the JAG core about the issue. (Winn Aff., ¶33; Martin Aff., ¶13)

36. The wage issue was resolved on September 2, 2009 with an e-mail from the human resources director explaining what led to the confusion. (Winn Aff., ¶34. Exh. P)

37. On October 3, 2009, plaintiff's deployment ended and his employment at BRMH was reinstated on October 8, 2009. (Winn Aff., ¶35; Gaynor Aff., ¶15)

38. Upon his return, it did not take plaintiff long to continue his stream of inappropriate e-mail communications concerning hospital policies and procedures and his behavior at the hospital continued to be both combative and erratic. (Winn Aff., ¶36; Martin Aff., ¶14; Gaynor Aff., ¶16)

39. Five days following his return, on October 13, 2009, plaintiff responded by e-mail to an e-mail from Dr. Martin concerning the ER staff having access to charts at the Krohn Clinic. (Winn Aff., ¶37, Exh. Q; Martin Aff., ¶14, Exh. E) In his e-mail, plaintiff continued to display his belligerent, inappropriate behaviors by commenting that "there would be no issue if clinic staff would finally take responsibility for patients admitted to them." (Id.)

40. While deployed, plaintiff remained in e-mail communication with Dr. Martin concerning scheduling upon his return. (Winn Aff., ¶38; Martin Aff., ¶15)

41. When he was informed what the schedule would be upon his return, he did not send any objection. (Martin Aff., ¶15)

42. Upon his return, plaintiff was frustrated with the schedule. (Winn Aff., ¶38; Martin Aff., ¶16, Exh. F)

43. Dr. Martin attempted to work with plaintiff about his frustrations and documented the situation concerning the schedule and the fact that two other doctors had offered to help the plaintiff but that he refused. (Winn Aff., ¶38, Exh. R; Martin Aff., ¶16, Exh. F)) Moreover, the only request for time off from Dr. Merritt during this time revolved around his desire to see his daughter, who lived out-of-state. (Martin Aff., ¶16)

44. At no time upon plaintiff's return did Stan Gaynor tell plaintiff that any redeployment would be unacceptable or not tolerated by BRMH, nor does Stan Gaynor recall any conversation with plaintiff upon his return that plaintiff believed he would be redeployed. (Gaynor Aff., ¶18)

45. Stan Gaynor was always supportive of plaintiff's military deployments, having served in the military himself. (Gaynor Aff., ¶19)

46. The only conversations Stan Gaynor recalls having with the plaintiff concerning his military involvement revolved around plaintiff's comments that deployments placed a burden on him personally. (Id., ¶18)

47. On November 2, 2009, plaintiff was notified that he should avoid calling the call doctor with a routine admission between 10:00 p.m. and 6:00 a.m. and was told that he would be reminded and admonished each time he contacted the call doctor in the overnight hours with a routine admission. (Winn Aff., ¶39, Exh. S; Martin Aff., ¶17, Exh. G)

48. Plaintiff's response was again angry, disrespectful and belligerent. (Winn Aff., ¶40, Exh. T; Martin Aff., ¶17, Exh. G)

49. A similar e-mail exchange took place in late October-early November 2009 concerning an alleged privacy breach of his desktop computer at the physician workstation. (Winn Aff., ¶41, Exh. U)

50. Although it was explained to plaintiff the reason the IT person was taking such action, plaintiff was not satisfied and his response clearly demonstrated that. (Winn Aff., ¶41, Exh. U)

51. A similar e-mail was received from plaintiff on November 29, 2009, concerning Remedy doctors and his opinion that the hospital should get rid of such "self-admitted 'pay whores'" which he claimed to be their words and not his own (Winn Aff., ¶42, Exh. V)

52. On December 1, 2009, it was reported that plaintiff continued to violate the policy of which doctors' name to put on admission orders. (Winn Aff., ¶43, Exh. W; Martin Aff., ¶18, Exh. H)

53. On December 11, 2009, plaintiff sent another e-mail voicing his opinion about the hospital's "inconsistent approach to chronic pain and the inappropriate use of narcotics in the ER." (Winn Aff., ¶44, Exh. X; Martin Aff., ¶19, Exh. I)

54. On December 14 2009, plaintiff sent an e-mail entitled "another 'our system doesn't work horror story'" again voicing complaints about how the hospital is run. (Winn Aff., ¶45, Exh. Y; Martin Aff., ¶20, Exh. J).

55. During this period of time, from October through December of 2009, plaintiff's behavior was erratic and combative and created a work environment that was extremely volatile. (Winn Aff., ¶46; Martin Aff., ¶21)

56. Plaintiff made statements to hospital staff that caused considerable fear and anxiety, including that "he doesn't deer hunt anymore because it is more fun to kill people." (Winn Aff., ¶46; Martin Aff., ¶22)

57. Plaintiff also stated "the only way administration will get me out of the building is with police" and showed certain hospital staff his conceal-carry permit for guns and staff was concerned he might bring a gun to work in his backpack. (Winn Aff., ¶46)

58. Due to these behaviors and the combative nature of the e-mails concerning hospital policy, the hospital determined it needed to move quickly to terminate plaintiff's employment. (Winn Aff., ¶47; Martin Aff., ¶23; Gaynor Aff., ¶¶20-21)

59. In light of plaintiff's erratic and combative behavior, the hospital was extremely sensitive to conducting the termination in a manner that would not be volatile and therefore chose to utilize the "no cause" provision in his contract to terminate his employment so that he could be removed immediately but be paid his salary through April 2011. (Winn Aff., ¶47) He was also provided the option, via proposed Separation Agreement, to voluntarily resign. (Merritt Decl., Exh. A)

60. The decision to terminate the plaintiff was the culmination of years of frustration and disappointment concerning his erratic behaviors and combative and argumentative attitudes regarding hospital policies and was completely unrelated to his military involvement. (Winn Aff., ¶48; Gaynor Aff., ¶22; Martin Aff., ¶24)

Respectfully submitted this 21st day of November, 2011.

          PETERSON, JOHNSON & MURRAY, S.C.
          Attorneys for Defendant, Black River Memorial Hospital, Inc.


BY:   s/ Maria DelPizzo Sanders
      Maria DelPizzo Sanders
      State Bar No.: 1031037
      Clayton L. Riddle
      State Bar No.: 1023267
      733 N. Van Buren, 6th Floor
      Milwaukee, WI 53202-4792
      Telephone: (414) 278-8800
      Fax: (414) 278-0920
      msanders@pjmlaw.com
      criddle@pjmlaw.com

F:\DOCS\201\0093\00706034.DOC