UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

DAVID B. MERRITT, M.D.,

Plaintiff,

v.

Case No. 10-cv-00840-wmc

BLACK RIVER MEMORIAL HOSPITAL, INC.,

Defendant.

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Defendant, Black River Memorial Hospital ("BRMH"), submits this response memorandum in opposition to plaintiff's motion for summary judgment. As demonstrated more fully below, plaintiff's motion should be summarily denied as (1) BRMH had cause to terminate plaintiff's employment; and (2) plaintiff has failed to make the initial required showing that his military status was a motivating or substantial factor in the decision to terminate him. Moreover, even if this court should find that the evidence presented by plaintiff is sufficient to meet that burden, BRMH has presented substantial evidence that his termination would have occurred despite his protected status.

For these and other reasons expressed herein and in submissions filed in support of defendant's brief, plaintiff's motion should be denied as a matter of law pursuant to Rules 56(b) and 56(c) of the Federal Rules of Civil Procedure. Moreover, if this Court finds that plaintiff has

failed to meet his initial burden of proof in this USERRA case, BRMH respectfully requests this Court to dismiss plaintiff's claim against BRMH as a matter of law.

## II. FACTS

The only facts offered by plaintiff in his brief include the fact that he worked as an emergency room physician for BRMH; was deployed in June 2009; returned in October 2009; and was terminated in December 2009. BRMH does not dispute any of these facts. What plaintiff left out of his brief are facts which overwhelmingly support BRMH's contention that plaintiff's protected status had absolutely nothing to do with his termination of employment from BRMH; that BRMH had cause to terminate the plaintiff's employment; and that BRMH would have taken the same action in terminating the plaintiff in December 2009 absent his protected status.

Plaintiff signed his first employment agreement with BRMH on December 9, 2005 and began his employment on January 15, 2006. (Defendant's Proposed Statement of Fact "DPSOF", ¶1) Not long thereafter, in April 2007, complaints were being received by Human Resources that plaintiff was making inappropriate comments in front of both patients and other staff. (Id., ¶2). One such comment that was reported was that upon seeing an attractive female patient, plaintiff commented that "she could sit on my face anytime." (Id) For that reason, on April 29, 2007, the director of human resources, Holly Fredrickson[1], held a meeting with the plaintiff to explain the hospital's harassment, behavior, and productive work environment policies. (Id. ¶3) It was explained to plaintiff at this time that some of the comments he was making were inappropriate; that he needed to think before he spoke; that he needed to consider

[1] Throughout plaintiff's employment, the director of Human Resources was Holly Fredrickson, later known as Holly Winn.

his audience; that he needed to be aware that patients may overhear him; and that he needed to be aware of employee perception. (Id, ¶4)

Following that meeting, the inappropriate behavior unfortunately did not cease. Incidents of inappropriate behavior occurred in October 2007, December 2007, January 2008 and February 2008. (Id, ¶5) As a result, plaintiff had another meeting with the human resources director and President/CEO of BRMH Stan Gaynor on February 28, 2008. (Id., ¶6) At that meeting, after reviewing the many instances of inappropriate behavior reported concerning the plaintiff, plaintiff received a written warning, was told that his behavior was unacceptable, and was told that his failure to change his behavior will result in further disciplinary action, up to and including termination. (¶7). Plaintiff was also informed that staff members were concerned that if they made complaints about his behavior that he would "make their lives miserable." (¶8) Plaintiff signed this written warning, disagreeing with only one of the statements reported. (Id., ¶9)

On August 25, 2008, the plaintiff and BRMH entered into a second employment contract, the term of which continued through January 2010. (Id., ¶10) Shortly after that contract was signed, behavior issues began to reoccur. (Id., ¶11) In October 2008, plaintiff continued to make inappropriate comments and also began to display anger management issues. (Id.) Specifically, on October 25, 2008, plaintiff approached another employee of BRMH, Carl Lash, who is an RN by trade and BRMH's ED Manager, while he was meeting with another doctor and staff member in a trauma room, and demanded certain medication for a patient. (Id., ¶12) When plaintiff was told it would not be given to him he yelled "this is fucking bullshit." (Id.) He was told that if he was going to talk in such a manner he would need to go to another area. Instead, he slammed the trauma room door shut and continued to yell and curse. (Id., ¶13) At the time of

this occurrence, there were at least four other ER staff present, a housekeeper, a paramedic student and at least two patients. (Id., ¶14) On that same date, Mr. Lash reported this incident and wrote of summary of the incident. (Id., ¶15)

Also in October 2008, it was reported that plaintiff made the comment concerning a paramedic student "who's the gay guy?" and when staff attempted to redirect the plaintiff, he commented "well, he's holding an old ladies' hand." (Id. , ¶16) This incident was also reported and documented. (Id.) As a result of these behaviors and others, another meeting was held on November 12, 2008, with plaintiff, the human resources director and Mr. Stan Gaynor, hospital President and CEO. (Id., ¶17) During this meeting, plaintiff was informed of the behaviors that had been reported; that the behaviors violated not only hospital policies but also his employment contract; and that he had been warned previously that such behavior could lead to further disciplinary action. (Id., ¶18) As a result, plaintiff was informed, both verbally and in writing, that he was being suspended for three days - - from November 19 through November 21 - - and that if his behavior did not change and he continued to violate company behavior policies and his employment agreement, he would be subject to further disciplinary action, including termination. (Id., ¶19). Plaintiff refused to sign the letter documenting this meeting and wrote that he would attach his own statement. (Id., ¶20) However, no such statement was ever received by Ms. Winn or Mr. Gaynor. (Id.)

At this time, due to the constant behavior issues being displayed by plaintiff, BRMH contemplated terminating plaintiff's employment. (Id., ¶21) However, because the hospital was short-staffed, and because BRHMH wanted to provide plaintiff every opportunity to improve his behavior as he was a valued employee and skilled physician, the hospital did not go forward with his termination at this time. (Id., ¶22)

Thereafter, on December 5, 2008, the Emergency Room Director, Dr. Carol Martin, met with plaintiff to discuss the fact that further inappropriate behaviors would not be tolerated and examples of inappropriate conversations were reviewed. (Id., ¶23) Plaintiff was told that when staff became aware that a conversation was approaching inappropriateness, he will be signaled with a "cut" gesture and his conversation/storytelling must stop. (Id., ¶24) This system was being put into place as plaintiff made it clear with Dr. Martin, Mr. Lash and Ms. Winn that he wished to be told when staff was uncomfortable with his conversation as he could not self-identify when there was a problem. (Id.) During this discussion, his anger outbursts towards Dr. Martin, patients and staff were also discussed. (Id., ¶25). Plaintiff was told at this time that if angry outbursts continue, further action would be pursued by human resources, and was also told that his angry outbursts and inappropriate conversations would be reported, with plaintiff's consent, to his physician for treatment of these issues. (Id., ¶26) In fact, Dr. Martin did contact plaintiff's physician to inform him of plaintiff's behaviors and systems put in place to curb those behaviors. (Id., ¶27)

Thereafter in February 2009, plaintiff communicated by e-mail with human resources that he believed a nurse was documenting everything he was doing that would justify getting him terminated. (Id., ¶28) In response, plaintiff was instructed to speak with the nurse about his concerns in order to keep the environment positive. (Id., ¶29) In response, plaintiff accused the nurse of having a personality disorder and stated it was a management issue. (Id.)

Thereafter, in March 2009, another issue arose concerning the routing of patient records to the Krohn Clinic. (Id., ¶30) Specifically, on March 11, 2009, it was reported to Ms. White-Jacobs, Vice President of Patient Care Services at BRMH, by Ms. Gina Ransom, that Ms. Ransom had a conversation with plaintiff that the records in question would be routed. (Id)

Plaintiff's response to her was both abrupt and belligerent. (Id.) Two months later, BRMH learned that the plaintiff was being deployed and plaintiff left for Afghanistan in June 2009. (Id., ¶31)

Although he was away from the hospital during his time, his communications with the hospital did not stop. (Id.,¶32) For instance, plaintiff was sending e-mail correspondence concerning other issues taking place at the hospital. (Id.,¶33) Such issues included a new initiative for ER staff members to have access to the Krohn Clinic records. (Id.) Plaintiff responded from Afghanistan, disagreeing with the policy. (Id.) Also during this time, in late July 2009, plaintiff began to e-mail human resources and others staff members about a wage issue. (Id., ¶34) Plaintiff believed that he was not properly paid for certain shifts and threatened to contact the JAG core about the issue. (Id., ¶35) The issue was resolved on September 2, 2009 with an e-mail from the human resources director explaining what led to the confusion. (Id., ¶36)

Shortly thereafter, on October 3, 2009, plaintiff's deployment ended and his employment at BRMH was reinstated on October 8, 2009. (Id., ¶37) Upon his return, his stream of inappropriate e-mail communications concerning hospital policies and procedures continued, and his behavior at the hospital continued to be both combative and erratic. (Id., ¶38) For instance, five days following his return, on October 13, 2009, plaintiff responded by e-mail to an e-mail from Dr. Martin concerning the ER staff having access to charts at the Krohn Clinic. (Id., ¶39) In his e-mail, plaintiff continued to display his belligerent, inappropriate behaviors by commenting that "there would be no issue if clinic staff would finally take responsibility for patients admitted to them." (Id.)

In addition, while he was deployed, plaintiff remained in e-mail communication with Dr. Martin concerning scheduling upon his return. (Id., ¶40) When he was told was the schedule would be upon his return, he did not send any objection. (Id., ¶41) However, upon his return, it was reported plaintiff was frustrated with the schedule. (Id., ¶42) Although Dr. Martin attempted to work with the plaintiff on the issues he raised, she also documented the situation concerning the schedule and the fact that two other doctors had offered to help the plaintiff but that he refused. (Id., ¶43) Moreover, although Dr. Martin does recall plaintiff requesting time off upon his return, it was time off to see his daughter in California and not because he needed rest. (Id.)

Coincidentally, this is the same period of time plaintiff alleges, without any supporting evidence other than his own affidavit, that Stan Gaynor made a comment to him sometime in October 2009 about the unacceptable nature of a potential reemployment in February 2010. Stan Gaynor denies ever making any such comment, as he was always supportive of plaintiff's and other employees' military deployments, having served in the military himself. (Id., ¶44-45) The only conversations Mr. Gaynor recalls having with the plaintiff concerning his military involvement revolved around plaintiff's comments that plaintiff felt deployments placed a burden on him personally. (Id., ¶46) Other than plaintiff's own affidavit, no evidence is offered and no other evidence exists that any such comment was ever made by Mr. Gaynor.

Thereafter, on November 2, 2009, plaintiff was notified that he should avoid calling the on-call doctor with a routine admission between 10:00 p.m. and 6:00 a.m. and was told that he would be reminded and admonished each time he contacted the call doctor in the overnight hours with a routine admission. (Id., ¶47) Plaintiff's response was again angry, disrespectful and belligerent. (Id., ¶48) A similar e-mail exchange took place in late October-early November

2009 concerning an alleged privacy breach of his desktop computer at the physician workstation. (Id., ¶49) Although it was explained to plaintiff the reason the IT person was taking such action, plaintiff was not satisfied and his response clearly demonstrated that. (Id., ¶50) A similar e-mail was received from plaintiff on November 29, 2009, concerning Remedy doctors and his opinion that the hospital should get rid of such "self-admitted 'pay whores'" which he claimed to be their words and not his own. (Id., ¶51)

On December 1, 2009, it was reported that plaintiff continued to violate the policy of which doctors' name to put on admission orders. (Id., ¶52) On December 11, 2009, plaintiff sent another e-mail voicing his opinion about the hospital's "inconsistent approach to chronic pain and the inappropriate use of narcotics in the ER." (Id., ¶53) Finally, on December 14 2009, plaintiff sent an e-mail entitled "another 'our system doesn't work horror story'" again voicing complaints about how the hospital is run. (Id., ¶54).

It was also during this period of time, from October through December of 2009, that plaintiff's behavior was both erratic and combative and created a work environment that was extremely volatile. (Id., ¶55) Among other things, plaintiff made certain statements to hospital staff that caused considerable fear and anxiety, including that "he doesn't deer hunt anymore because it is more fun to kill people." (Id., ¶56) He also remarked that "the only way administration will get me out of the building is with police," and showed certain hospital staff his conceal-carry permit for guns and staff was concerned he might bring a gun to work in his backpack. (Id., ¶57)

Due to these behaviors and the combative nature of the e-mails concerning hospital policy, the hospital determined it needed to move quickly to terminate plaintiff's employment.

(Id., ¶58) In light of his erratic and combative behavior, the hospital was extremely sensitive to conducting the termination in a manner that would not be volatile and therefore chose to utilize the "no cause" provision in his contract to terminate his employment so that he could be removed immediately but also be paid his salary through April 2011. (Id., ¶59) Plaintiff was also provided an option, through a proposed Separation Agreement, to voluntarily resign his position but chose not to do so. (Id.)

Contrary to plaintiff's allegations, the decision to terminate the plaintiff was the culmination of years of frustration and disappointment concerning his erratic behaviors and combative and argumentative attitudes and was completely unrelated to his military involvement. (Id., ¶60)

## III. STANDARD FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56 provides the standard applicable for motions for summary judgment. In pertinent part, it provides summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Because the plaintiff is moving for summary judgment, he bears the burden of proof. *See* Niccum v. Meyer, 171 B.R. 828, 831 (Bankr. N.D. Ill. 1994).

In seeking summary judgment, it is plaintiff's burden to prove there is absolutely no genuine issue of material fact that exists. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All that is required of BRMH to overcome plaintiff's motion for summary judgment is to identify a genuine issue of material fact. That fact need not "be resolved conclusively in

favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*., at 248-49. Any factual issues of controversy must be resolved in favor of the non-movant to the extent that the motion must be denied where facts specifically averred by the non-movant contradict facts specifically averred by the movant. Robinson v. Morris Moore Chevrolet-Buick, Inc., 974 F.Supp. 571 (E.D. Tex. 1997).

As demonstrated below, facts exists which overwhelmingly support a finding that not only did plaintiff fail to meet his burden of proof on summary judgment but also failed to meet his burden of proof on the claims asserted against BRMH. Therefore, if this court should find that plaintiff does not have sufficient evidence to meet his burden of proof on either of the claims asserted under USERRA, this Court has the authority, pursuant to Fed. R. Civ. P. 56(f)(1), to grant summary judgment in favor of BRMH and dismiss plaintiff's claims as a matter of law.

## IV. ANALYSIS

Plaintiff has asserted two claims against BRMH under USERRA: (1) that BRMH discharged him without cause in violation of 38 U.S.C. Sec. 4316(c)(2); and (2) that his military service was a motivating factor in BRMH's decision to discharge him in violation of 38 U.S.C. Sec. 4311. As the evidence in this case does not support either claim, plaintiff's claims must fail as a matter of law.

### A. BRMH Had Cause to Terminate Plaintiff's Employment.

As noted in plaintiff's brief, Sec. 4316(c) of USERRA temporarily changes the employment status of returning veterans. If, as in this case, the employee's military service was more than thirty (30) days but less than 181 days, the employee cannot be discharged "except for

cause" within the first 180 days of reemployment. 38 U.S.C. Sec. 4316(c)(2). However, the statute does not define the term "cause."

Plaintiff argues that because BRMH did not terminate plaintiff "for cause" as that term is defined in plaintiff's employment contract with BRMH, BRMH violated this section. However, the statute grants to the Secretary of Labor authority to prescribe regulations implementing USERRA "with regard to the application of this chapter . . . to private employers" and that is the definition of cause that is applicable to the determination of whether BRMH violated this particular section of the statute. 38 U.S.C. Sec. 4331.

Under that authority, the Department of Labor has issued a regulation entitled "What constitutes cause for discharge under USERRA?" 20 C.F.R. 1002.248. The regulation provides, in pertinent part:

> The employee may be discharged for cause based either on conduct or, in some circumstances, because of the application of other legitimate non-discriminatory reasons (usually involving economic conditions and the like). (a) In a discharge action based on conduct, the employer bears the burden of proving that it is reasonable to discharge the employee for the conduct in question and that the employee had notice, which was express or can be fairly implied, that the conduct would constitute cause for discharge.

Id. As noted above, BRMH terminated plaintiff based on his conduct. Therefore, if it was reasonable to discharge plaintiff for his conduct and if plaintiff had notice that his conduct would be cause for discharge, plaintiff's claim against BRMH must fail.

On the first issue, whether it was reasonable to discharge plaintiff for his conduct, plaintiff argues it was not as BRMH did not terminate plaintiff utilizing the "for cause" provision

of his employment contract. Unfortunately, plaintiff's claim fails, as many courts have held that the cause necessary for discharge under Sec. 4316 need not be legal cause but "may be such cause as a fair-minded person may act, and where such action is not arbitrarily taken with a purpose or as an excuse to avoid the statute." Rademacher v. HBE Corp., 2011 WL2718147 (8th Cir. 2011), citing Keserich v. Carnegie-Illinois Steel Corp., 163 F.2d 889, 890 (7th Cir. 1947). In other words, conduct-based cause is not limited to employee misconduct as that term may be defined either in an employee's contract or under other legal standards. The standard set forth in the regulation above, and supported by case law, is one of reasonableness, i.e., whether it is reasonable to discharge the employee for the conduct in question." See, 20 C.F.R. §1002.248(a). In other words, BRMH meets it burden of proof on this claim if it satisfies some objective standard of cause. Rademacher, supra.

Using this definition, BRMH was permitted to discharge plaintiff for conduct that may not be recognized as legal cause and does not necessarily constitute misconduct (either as defined by his employment contract or otherwise) but it must have been "fair to discharge the veteran because of his conduct." Rademacher, supra, citing Hillman v. Ark. Highway & Transp. Dep't., 39 F.3d 197, 200 (8th Cir. 1994). Under the facts presented by this case, it was more than reasonable to discharge plaintiff based on his erratic and combative behaviors over the course of his employment and especially based upon his conduct in the last two months of his employment, during which his behavior was creating an extremely volatile work environment. (DPSOF, ¶55) Without question, BRMH attempted to work with the plaintiff throughout his period of employment to curb his inappropriate and combative behaviors, but such behaviors continued and BRMH believed it necessary to terminate the plaintiff when it did for the sake of the hospital and its staff. (DPSOF, ¶¶3, 4, 6, 7, 17, 18, 19, 23, 24, 26, 58-60)

Moreover, because of the combative and erratic behaviors displayed by the plaintiff in the past, BRMH was extremely sensitive to conducting plaintiff's termination in a manner that would not be volatile and therefore chose to utilize a provision in his contract wherein he could be terminated immediately but continue to be paid his salary through April 2011. (DPSOF, ¶59)

Finally, in regards to whether plaintiff had notice that his conduct would constitute cause for discharge, it is undisputed plaintiff received numerous warnings prior to his discharge that inappropriate and combative conduct would be cause for discharge. (DPSOF, ¶¶7, 18, 23, 26) However, even if prior written notification was not provided, notice under USERRA can be either express or fairly implied that the conduct would constitute cause for discharge. See, 20 C.F.R.§1002.248. Without question, it would be implied for any staff member of a hospital that behavior which is both erratic and combative could be cause for discharge.

As plaintiff's discharge by BRMH was reasonable under the circumstances and because plaintiff had notice, both express and implied, that such conduct could led to termination, BRMH's termination of the plaintiff was proper and not in violation of 38 U.S.C. §4316.

**B. Plaintiff Has Failed to Show that His Military Involvement was a Motivating Factor in BRMH's Decision to Terminate Him.**

Plaintiff's second cause of action against BRMH is that plaintiff's military involvement was a motivating factor in the decision to terminate him. The facts of this case fail to support such a claim.

USERRA prohibits employers from discriminating against employees on the basis of military service. 38 U.S.C. §4311. A violation occurs when a person's military service is a "motivating factor" in the discriminatory action, even if it is not the sole factor. 38 U.S.C. §4311(c)(1). Under §4311, the plaintiff bears the initial burden of showing by a preponderance

of the evidence that (1) the defendant denied him retention in employment; and (2) that plaintiff's military services was a "substantial or motivating factor" in the adverse employment action. Sheenan v. Dep't of the Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001); Gagnon v. Sprint Corp., 284 F.3d 839, 854 (8th Cir. 2002). If this requirement is met, the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason. Sheenan, supra, 240 F.3d 1013.

As noted above, to establish a certain factor or factors as a motivating factor, a claimant need not show that is was the sole cause of the employment action but rather that it is one of the factors that a truthful employer would list if asked for the reason for its decision. Brandsasse v. City of Suffolk, 72 F.Supp.2d 608 (E.D.Va. 1999). Stated otherwise, military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration. Id. at 617. No such evidence exists in this case. As noted above, the decision to terminate plaintiff had nothing to do with his military status and had everything to do with his combative and erratic behaviors that could no longer be tolerated in a hospital environment. (DPSOF, ¶¶55-60)

The only evidence upon which plaintiff relies to support his burden of proof on this issue is an alleged statement made by BRMH's CEO that further military deployments would not be tolerated. First, the hospital CEO denies ever making any such comment. (DPSOF, ¶44) However, even if plaintiff could somehow prove that such a comment was ever made, before seemingly stray workplace remarks will qualify as evidence of discrimination, the employee must show that the remark was related to the employment decision ultimately made, as such remarks unrelated to the decision process are rarely given great weight, particularly if they were

allegedly made temporally remote from the date of the decision. See, i.e., Hoffman v. MCA, Inc., 144 F.3d 1117 (7th Cir. 1998); Gannon, supra, 422 F.Supp.2d 504, 508. No such evidence exists in this case that any such remark was related to the ultimate decision to terminate plaintiff and the alleged remark was made more than two months prior to the date of his termination.

Second, BRMH had no indication or knowledge that plaintiff would be redeployed (as plaintiff had, by his own admission, received an honorable discharge and no further deployments were anticipated), so potentially redeployment was never and could not have been a factor in BRHM's decision to terminate plaintiff. (DPSOF, ¶¶44, 60)

Third, the alleged comment was made more than two months after plaintiff returned, rendering any implication of proximate in time inappropriate. See, i.e., Hance v. Norfolk Southern Ry. Co., 571 F.3d 511 (6th Cir. 2009) (liability based in part on termination immediately upon return from a two-week training); Mills v. East Gulf Coal Preparation Co., LLC, 2010 WL 2509835 (S.D.W. Va. 2010)(temporal relationship of disciplinary meeting with supervisor occurring same day as plaintiff's enlistment); Harris v. City of Montgomery, 322 F. Supp.2d 1319 (M.D. Ala. 2004)(plaintiff demoted on same day he informed supervisor of military training requirements); and Gillie-Harp v. Cardinal Health, Inc., 249 F.Supp.2d 1113 (W.D. Wis. 2003)(plaintiff terminated one month after informing supervisor of upcoming leave). As recently noted by the Rademacher court, a two-month period of time between the employee's return from military duty and his discharge weakens any inference that the employee's military service was a motivating factor in the employer's decision to terminate him.

As noted above, in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the employer's decision to

terminate him. As plaintiff has failed to set forth sufficient evidence to support such an initial finding that his membership in the uniformed services was a motivating factor in BRMH's decision to terminate him, his claim under 38 U.S.C. ¶4311 fails as a matter of law.

### C. BRMH Would Have Terminated Plaintiff in the Absence of Military Status.

As noted above, plaintiff has failed to meet his initial burden to prove that his military status was a motivating factor in BRMH's decision to terminate him. However, even if plaintiff had met his required burden, his claim must fail as BRMH had a legitimate reason to terminate him.

As noted above, a burden shifting framework is used to determine whether an employer discharged a member of the armed forces in violation of USERRA. Under that framework, the plaintiff is first required to establish a *prima facie* case of discrimination by showing by a preponderance of the evidence that his protected status was a motivating factor in the adverse employment action. 38 U.S.C. §4311(c). If, and only if, this is established, the defendant may nonetheless escape any liability for any alleged violation of USERRA by showing by a preponderance of the evidence that it would have made the same decision without regard to the employee's protected status. 38 U.S.C. §4311(c)(1). Stated otherwise, the employer has the burden to show that its legitimate reason, standing alone, would have induced it to make the same decision. See, Robinson v. Morris Moore Chevrolet-Buick, Inc. , 974 F.Supp. 571 (E.D. Tex. 1997). If the problems with the employee were so substantial that a fact-finder could reasonably conclude that the problems were enough, in and of themselves, to cause the employer to act in the same way, the employer will have met its burden. Madden v. Rolls Royce Corp., 563 F.3d 636 (7th Cir. 2009).

In this case, evidence of such substantial issues with plaintiff clearly existed. Without question, BRMH attempted to work with the plaintiff concerning his inappropriate behaviors over a period of years but those behaviors continued to the point where the environment in the hospital was both volatile and combative. (DPSOF, ¶¶3, 4, 6, 7, 17, 18, 23, 24, 26, 58, 60) The decision to terminate the plaintiff was the culmination of years of frustration and disappointment concerning his erratic behaviors and combative and argumentative attitudes regarding hospital policies and was completely unrelated to his military involvement. (DPSOF, ¶60)

As all of the evidence in this case support the conclusion that BRMH would have terminated plaintiff regardless of his military status or involvement, as it had a legitimate reason to do so, BRMH has met its burden in this regard and plaintiff's claim fails as a matter of law.

## V. CONCLUSION

As demonstrated above, BRMH's decision to terminate the plaintiff had everything to do with the frustration of attempting to deal with plaintiff's combative, argumentative, inappropriate and erratic behaviors over a period of years and had absolutely nothing to do with his status in the military. In fact, BRMH provided plaintiff numerous opportunities to improve his behavior as he was an extremely skilled physician. Unfortunately, his behaviors continued and the hospital felt it had no choice but to terminate his employment.

BRMH's decision to terminate the plaintiff was with proper cause as that term has been defined in USERRA cases and was not motivated in the least by his military activities. Furthermore, even if this court could somehow find that plaintiff met his burden of proof to show such improper motivation, BRMH has brought forth sufficient evidence to support a finding that it would have taken the same action notwithstanding his military status.

For these reasons, BRMH requests this court to not only deny plaintiff's request for summary judgment but to find that plaintiff's has failed to set forth sufficient evidence to support his claims under USERRA and that said claims must be dismissed as a matter of law.

Dated at Milwaukee, Wisconsin, this 21st day of November, 2011.

By: s/Maria DelPizzo Sanders
Attorneys for Defendant
Black River Memorial Hospital
Clayton L. Riddle
State Bar No. 1023267
criddle@pmlaw.com
Maria DelPizzo Sanders
State Bar No. 1031037
msanders@pjmlaw.com
Peterson, Johnson & Murray, S.C.
733 North Van Buren Street, Sixth Floor
Milwaukee, WI 53202-4792
414-278-8800
414-278-0920 (Fax)

F:\DOCS\201\0093\00704750.DOC